PETER SMITH, Respondent, *v.* P. A. MORSE *et al.,* Appellants.

Corporations are bound to follow strictly the letter of their charter, and can exercise no power unless granted to them, or absolutely necessary to carry out the power so granted.

The first charter of the city of San Francisco does not authorise the creation of a sinking fund commission *in terms;* nor is there any clause under which it can be exercised even by implication.

The power to sell does not include an authority to create a new department of city government, to divert the revenues from their legitimate source, and place them in hands neither chosen by, or responsible to, the corporators.

The common council must exercise the functions imposed by their charter, and · have no power to delegate them to others.

The power to sell does not include the power to make a deed of trust, with power to the trustees to sell the trust estate as they may *deem advisable.*

A conveyance that would come within the Statute of Frauds if made by an individual, if made by a corporation would be liable to the same construction, and if void in the former case, would be void in the latter.

Such conveyance will not affect the lien of a judgment regularly obtained against the grantor.

A deed, void by reason of fraud, cannot be made valid by an act of the Legislature, so as to affect the rights of third persons.

Qu. If the intention of the Legislature by the act of May, 1851, to confirm the void acts of the Common Council, and the deed to the commissioners of the Sinking Fund, can be fairly inferred from the language of the act.

The Legislature may, from time to time, alter or change the remedy, provided they do not materially affect the *right;* but whenever they so far alter the remedy as to impair, destroy, change, or render the right scarcely worth pursuing, they necessarily impair the obligation of the contract upon which such right is founded.

An act which divests the lien of the creditor altogether, which exempts the property of the judgment debtor from execution, places it in the hands of trustees with power to sell as they may think proper, and compels the creditor to fund his scrip at a less rate of interest, and submit to a delay of twenty years, without any guaranty that he will then receive the principal, and that renders the creditors right worthless, by withdrawing his remedy, and such is the act to fund the indebtedness of the city, which therefore impairs the obligation of contracts, and is unconstitutional and void as against the plaintiff.

The act of 15 April, 1851, re-incorporating the city of San Francisco by its provisions, continued the body politic as a corporation, and did not extinguish

the debts of the city incurred under the former charter, nor did its property escheat to the State. An act passed with such intention, would be unconstitutional and void.

The city cannot set up a right in the State, to defeat a claim against her. If her right, title and interest in property has been sold by the sheriff, and the State has any right, the latter can assert it when she chooses to have it ascertained.

By the Statute of 1850, personal property levied on by the sheriff, must be actually seized and sold in *presence of the purchaser.* While a lien attaches to real estate upon the filing of the transcript, and the same is to be sold *in front of the Court-house door ;* and all leasehold estates of more than one year are to be so disposed of.

The clerk of the Court has power to issue a *venditioni exponas* at common law, or under the statute "to regulate proceedings in the District Courts," of 1850, p. 24, which authorises the Court to frame new writs and process, and to issue such executions and other writs as may be necessary to carry their judgments into full force and effect."

The act of the city of San Francisco creating the board of Sinking Fund Commissioners, and the deed executed to them of all the property of the city, is void for want of power in the city, and because said deed is within the Statute of Frauds.

The act of May 1st, 1851, funding the debt of the city, is unconstitutional, so far as the rights of the plaintiff are affected thereby; and the levy and sale are regular and valid.

APPEAL from the Superior Court of the City of San Francisco. The statement of facts in this case sets forth the Act of 15th April, 1850, incorporating the City of San Francisco, art. 1, and 2d section of which gives the city the right to " grant, purchase, hold, and receive property, real and personal, within said city, and to lease, sell, and dispose of the same for the benefit of the city." Section 1st of art. 2d, allows the Mayor and Common Council " to borrow money and pledge the faith of the City. therefor, provided the aggregate amount of the debts of the City should never exceed three times the amount of its estimated revenue." Sect. 9, to provide for the erection of public buildings, &c., and all lawful improvements, &c. 21. To provide for the appointment of all necessary officers, &c. 29. To appropriate money for any item of city expenditure, and provide for the payment of her debts, &c. Art. 5, provides that the Legislature may, at any time, alter, amend, or repeal the charter. See Statutes, 1850, 223 et seq.

On the 23rd of August, 1850, an ordinance was passed by the Mayor and Aldermen for the creation of a city stock, to be called a Sinking Fund Stock, for the erection and promotion of city improvements,—limiting the amount to $500,000,—prescribing the periods of its redemption, and pledging " all the city lots, or real estate in possession of the City, as security for the redemption of the said stock and interest at their maturity." Sect. 5, provides for the appointment of five persons who shall constitute a board, to be entitled the Commissioners of the Sinking Fund, to be composed of the Mayor and Comptroller and three citizens, who shall give bonds for faithful performance, &c., to the amount of $100,000 each; who, by sect. 6, were to have charge of all real estate belonging to the City, to lease or sell the same as in their judgment should be deemed advisable, for its benefit, and · as shall be required to provide funds for the redemption of the public debt. Sect. 7, directs the mode of disposing of the City property,—that it shall be advertised two weeks, and sold at public auction to the highest bonâ fide bidder.

By the ordinance of 1st October, some of the provisions of the foregoing ordinance were altered; the stock was increased to $800,000, and the security reduced to $100,000 by a joint bond from all the commissioners, and requiring them to report quarterly a statement of receipts and disbursements, &c.

On the 23d December, an ordinance was passed, requiring the presidents of the two boards of aldermen to sign the deed of trust for the conveyance of the city property to the commissioners of the Sinking Fund on behalf of the city.

By deed, dated 25th December, 1850, the city, in consideration that the grantees had accepted the appointment of commissioners of the Sinking Fund, and given bond and security for faithful performance, &c., " did *bargain, sell* and *convey* unto John W. Geary, William Hooper, James King, of Wm., Benjamin L. Barry and Talbot H. Green, of said city, as the Commissioners of the Sinking Fund, &c., and their successors and assigns, all" (a large number of beach and water lots and upland lots, and a number of wharves, &c., particularly described): In trust that the said commissioners shall have charge of all the said lots, &c. as a security for the redemption of the bonds and interest issued under the ordinances, 49 and 67 (above recited:)

*And to lease and sell* the said lots as in their judgment should be for the benefit of the said city, and shall be requisite to provide funds for the redemption of the said bonds and interest; which deed was duly executed 26 December, 1850, and recorded the 6th January, 1851.

By the ordinance of 20th January, 1851, the Commissioners of the Sinking Fund are authorised to receive city scrip, or audited accounts against the city, in payment of any of the lands and property *conveyed to them,* and which might be sold by them.

On the 15th April, 1851, the legislature passed an act, re-incorporating the city—enacting that the people of the said city shall *continue to be* a body politic and corporate, under the style of the "City of San Francisco," granting the usual powers and the right to purchase, receive and hold property, real and personal, and to sell and dispose of the same for their common benefit—providing for the organization and the election of officers, &c.    Section 14 provides that all money received from the sources mentioned in the section, "shall continue to constitute a sinking fund, for the payment of the existing city indebtedness and interest thereon, until the same shall be cancelled.    The sources named, include "the net proceeds of all sales of real estate, bonds and mortgages, for occupation of wharves, basins and piers, wharf-rents and tolls, and prohibits the loaning of the fund, or its application to any other purpose.

Art. 4, sect. 1, vests the executive power in the mayor, and *such other executive officers as are, or may be, created by law,* and prohibits the common council, any committee or member thereof, from performing any executive or ministerial business, unless *specially directed by law.*

Section 20, provides that the officers of the present city government "shall continue in office *under this charter, with such powers and duties as are herein prescribed,* until their successors are qualified, and *nothing herein contained shall be construed to release any persons heretofore holding office in said city* from any personal liability which they may have incurred by their official acts.    And article 6, section 12, repeals the act entitled an Act to incorporate the City of San Francisco, passed April 15th, 1850.

Before the passing of the above act, an act was passed April 1st, 1851, which enacted, that the city should not have power to either sell, lease, or in any manner convey, any lands situated within the corporate limits, from the passage of this act until the 10th of May next, or thereafter. And prohibited any officer, commissioner or agent of the said city, from making any disposition of such lands contrary to the said act, and declaring any such sale, &c., void.

By act of 1st of May, 1851, the legislature authorised the funding of the floating debt of the city, and the providing for the payment of the same. And P. A. Morse, D. J. Tallant, William Hooper, John W. Geary, and James King, of Wm., were appointed and *constituted commissioners of the funded debt.* And this act directs their organization as a board. Section 2 authorises the commissioners to issue certificates of stock to an amount equal to the aggregate of the floating debt at the time of passing the act, bearing ten per cent. interest. And section 3 authorises them to exchange such certificates with creditors, in extinguishment of an equal amount of the floating debt.

Sect. 4, directs the Commissioners to certify to the City assessor the amount necessary to be raised for payment of the interest of the funded debt for the current year, and that the assessors add such amount to the amount authorised to be raised for other purposes, and also the further sum of $50,000 yearly for a sinking fund for the redemption of the said stock; and directs the payment thereof by the Treasurer to the Commissioners, before any payments are made for other purposes.

Sect. 5, directs the Commissioners, out of the money so raised and paid them, to pay the interest of the stock when due, and apply the balance to payment of the principal, &c., and to render an account yearly to the Councils.

Sect. 6, provides for the redemption of the stock, and after the execution of the trust for its surrender, and for the reconveyance of the remaining property &c., to the City.

Section 8, authorises persons "holding indebtedness of any character against the city," to exchange the same for said certificates, as provided in section 2.

Section 9, requires creditors, to entitle them to the benefits of

this act, to signify their election within ninety days after its passage, or after the settlement and approval of their claims.

Section 11, exempts forever from sale by execution, " all property of the City of San Francisco, which is necessary to be retained for all or any of the municipal purposes of the city."

By section 12, the commissioners of the sinking fund, created by the ordinance of councils, are required to convey to the said commissioners of the funded debt, all the property, and all their right, title and interest in property belonging to the city, and to pay over all funds in their hands, &c.   And said commissioners are authorised to expose to public sale, or to lease the property, so to be conveyed, at such times and places as the interests of the city may require, and apply the proceeds to the liquidation of the floating debt of the city.

Section 14, directs surplus funds in the hands of the commissioners, to be applied to the extinguishment of stock, and the method.

By deed, dated 24th May, 1851, (acknowledged 31st of same month,) Geary, Barney, Talbot, Green, Hooper, and King, commissioners of the sinking fund, did grant, bargain, sell and convey unto Morse, Talbot, Hooper, Geary, and King, the commissioners of the funded debt, all the lots, wharves, &c., described in the deed of December 25th, 1850, except such as had been sold by the commissioners of the sinking fund; to hold the same in trust, to have charge of the same, and with power to sell or lease the said lots, &c., as in their judgment may be for the benefit of the said city, and to apply the proceeds according to the provisions of the said act of May 1st, 1851.

On the 25th January, 1851, Peter Smith (the plaintiff) recovered judgment in the Superior Court of San Francisco against the city, for $19,239, with interest at 3 per cent. per month, from January 8th, 1851; which judgment was signed March 4th, 1851.

On the 4th of March, 1851, Smith recovered another judgment (signed the 10th of the same month,) in the same Court, against the city, for $45,538.32, with interest at 3 per cent. per month, from the date.

On the 8th of March, the clerk of said Court issued execution on the judgment of 25th of February, commanding the sheriff

34

to satisfy the same out of the personal property, and if sufficient could not be found, then out of the real property belonging to the said city, at or after the date of the judgment, and to make return within forty-one days. The sheriff returned that he had levied on the City Hall, the Hospital, and the Prison Brig, and several wharves, but that the sale was stayed by injunction.

On the 10th of March, 1851, the clerk issued a similar execution on the judgment of 4th of March, to which the sheriff returned, on the 3rd of April, 1851, that he had levied on all the lots conveyed to the commissioners of the sinking fund, by the deed of 25th of December, as per schedule annexed, but that the sale was stayed by injunction.

On the 22nd of May, the clerk issued a writ, reciting the execution of March 8th, and commanding the sheriff "to cause to be sold the property so levied on," for the best price, &c., and to make return, &c. On the 20th of August, the sheriff returned that he had sold the City Hall, the Hospital, and the wharves, for $8050.

On the 27th of May, execution issued on the judgment of February 25th, for the balance, $1369.88, due thereon. On the 19th of September, the sheriff returned, that he had sold to divers persons several lots, specifying them, for an aggregate of $5,494.50, and had otherwise made on the execution $1254, making together, $6,749.36.

On the 8th of December, 1851, another execution issued on the same judgment, for a balance of $8,194.10. On the 12th of January, 1852, the sheriff returned, that he had levied on a large amount of water property, as described, and by order of Court sold the same on the 2nd of January, 1852, to McDougal, Bell, and Malony—nine of the tracts levied on, for $19,800—(describing them,) and further returned the execution, satisfied.

On the 22nd of May, 1851, the clerk issued a writ, reciting the execution of March 4th, and the levy and return of the sheriff, (particularly describing the property,) and commanding the sheriff to "cause to be sold the property so levied on, for the best price that can be got for the same, and have the money," &c. On the 20th of August the sheriff returned this writ, that by virtue of the same, he had levied upon all the right, title and interest of defendants, in and to the following described pro-

perty, and after giving due notice, according to law, sold the said property as per schedule annexed, for $47971.50; among the lots sold, No's. 509, 135, and 139, were bid off by Smith, for $1080, and which were described in the writ; the sale was made the 14th of June, 1851, but some of the purchasers failing to pay their bids, a re-sale of such lots was made on the 25th of the same month.

By deed, dated June 14th, 1851, (acknowledged 18th of July,) reciting the judgment of 4th of March, and that it was recorded on the 14th of March, 1851; the issuing of the execution of the 10th of March, and the levy thereon, and the return; the writ of May 22nd, 1851, commanding the sheriff, that he "*should cause to be sold the property so levied* on," &c.; *the advertisement of said property, in pursuance of the said last mentioned writ,* to be sold in front of the court house, &c.; that at the time and place advertised, he offered the same for sale, and that Smith become the purchaser of thirty lots, among which, were lots 509, 135, and 139, for $13,465, &c.; the sheriff therefore granted, &c., to Smith, *in fee,* all the estate, right, title, &c., which the city had, at and after the recording of the judgment, in the said thirty lots.

On the 8th of December, 1851, an execution was issued on the judgment of the 4th of March, for a balance of $8,272; on the 12th of January, 1852, the sheriff made return on this writ, similar to his return on the writ of the same date, issued on the judgment of the 25th of February, stating the sale to McDougal, Becket and Malony, in the same manner, but without any reference to the other writ, and returned the execution "satisfied."

On the 1st of July, Smith filed his complaint in the Superior Court, against Morse and others, who claim to have been appointed commissioners of the funded debt of the city, but whose authority he denied, &c. It stated the judgments of the 25th of February and 4th of March, and the writs of the 2nd of May, and proceedings and sale thereon; that plaintiff's judgments were a lien upon all the property claimed by defendants; that, owing to the interference, claims, and representations of the defendants, as to the title of the property, plaintiff had been unable to realize his judgments, as many persons were deterred from buying, &c.; that defendants wrongfully claimed to be entitled

to the property, and had subdivided it into upwards of 3000 lots, and advertised them for sale on the next day; the consequence of which would be to interest numerous persons in the property, and disturb and cloud his title, &c.; that the plaintiff had been damaged by the wrongful acts of the defendants to the amount of $25,000, and would be irreparably injured, unless defendants were restrained from selling the property. Prayer that defendants be enjoined from selling, and for judgment against them, for $25,000 damages; that the injunction be made perpetual, and for general relief.

An order was made, restraining the defendants as asked till the further order of the Court.

The defendants filed a demurrer, which was afterwards withdrawn, and at the same time answered, relying on the deed of December 25th, 1850, the Act of May 1st, 1851, the deed of May 24th, 1851, and the City ordinances ; and denied, that the property was liable to the plaintiff's judgments or executions.

On the 19th July, plaintiffs filed an amended complaint, charging that the deed of December, 1850, and the ordinances creating a Sinking Fund, were unauthorized by law and void ; that the deed was intended by the Board of Aldermen to place the property of the City beyond the reach of its creditors, and was fraudulent ; and that the Act of May 1st, 1851, was unconstitutional, so far as it affected the liens of the plaintiff's judgments. It then averred, that at the sale of June 14th, 1851, plaintiff purchased Beach and Water lots, No. 509, and upland lots, Nos. 135 and 139, and received a deed therefor, which the defendants would have sold but for the injunction. Prayer as in the original complaint.

The defendants answered, denying the alleged fraud and insisting on the validity of the deeds, &c.

A motion to dissolve the injunction was overruled.

On the 17th September, the case was referred by consent to John H. Saunders, Esq. to hear and determine the issues of fact, and of law, and report to the Court.

The evidence adduced before the referee, consisted of the judgments; the dates they were recorded ; the several executions and returns of the sheriff; the deed from the sheriff to the plaintiffs; the trust deeds as above stated ; the admissions of defendants,

that the property described in the complaint, was the property of the City at the date of the deed of December, 1850; that at the said date the debt of the City exceeded three times its annual revenue; that no stock was ever purchased under the ordinances, Nos. 49 and 67; that neither the City nor the Commissioners of the Sinking Fund "received any consideration to create a use" under the said ordinances; that at the time of the execution of the deed of December, 1850, the City was without money, and could not borrow to pay her debts; that John W. Geary was President of the Commissioners of the Funded Debt.

A proclamation of the Commissioners of the Funded Debt, dated 13th June, 1851, warning all persons not to purchase at the sale under Smith's executions; and the admission, that Gallagher and Vanfelker would swear that the said proclamation was the cause of their not taking deeds for property purchased by them at the sale on Smith's executions.

A printed catalogue of lots included in the trust deeds, advertised to be sold by the Commissioners of the Funded Debt on the 2d July, 1851.

The Act of May, 1851.

Proof that Geary warned persons present not to bid, and that some of the purchasers refused to pay their bids on account of representations made by the Commissioners. That in consequence of these representations, the lots sold at a great sacrifice, and would have brought five times what they sold for but for the doubt as to the title.

That Smith could not borrow money on the security of the lots purchased by him; and had to pay a high rate of interest, &c., ten per cent. per month.

Geary testified that no money was borrowed, and no bonds issued by the Commissioners of the Sinking Fund. When the deed of December, 1850, was executed, the City debt was about $1,000,000. A sale of $55,000 made in June, 1852, was consumed pretty much in expenses. The Commissioners endeavoured to obtain a loan, but failed; the City property was worth $350,000 cash, exclusive of the government reserves, &c.; the annual revenue was from three to four hundred thousand dollars; the Commissioners of the Funded Debt have issued bonds to the

amount of $1,280,000.   The Commissioners organized May 15, 1851.

On the 13th October, 1851, the Referee filed his report, refusing damages to the plaintiff, and stating that in his opinion he had no cause of action, and recommending that the injunction be dissolved.

On the 20th of October, 1851, Smith moved to set aside the report of the referee; and on the 24th November, the Court set it aside, and granted a new trial.

On the 8th January, 1852.   Smith filed his supplementary and amended complaint, charging that when the deed of December 25th, 1850, was made, the City was indebted more than three times the amount of its annual revenue, and destitute of funds, and without power to borrow money; that the sums for which plaintiff recovered the said judgments, were then owing and due to him by the City; that the said deed and the deed of May 24, 1851, were made with the intent to defraud creditors; that the Act of May 1, 1851, was procured to be passed by defendants in pursuance of the same fraudulent intent; and that the said act was unconstitutional and void.   That on the 6th September, 1851, the plaintiff recovered another judgment against the City for $13,960, with interest; that plaintiff was lawfully seized, &c. of said lots, Nos. 509, 135 and 139; that the pretended title of defendants was a cloud thereon, &c.

Prayer in addition to the relief before prayed; that the deed of May 24th, 1851, be set aside, and the said ordinances and act of the Legislature, and all acts, &c., in pursuance thereof, be declared void, and for general relief.

Defendants answered, denying all the allegations of fraud and insisting on the validity of the deed, ordinances and statute.

In June, 1852, a jury was waived by the parties, and the cause tried by the Court.

The clerk proved the testimony and admissions before the referee; and the following testimony was adduced.   An admission, that the act of 1st May, 1851, was procured to be passed on the application of the City and the Commissioners of the Sinking Fund, and the bill prepared at their instance; and while it was pending before the Legislature, the Commissioners sued

out an injunction, restraining Smith from selling the property conveyed to him under his executions.

An admission that lot, No. 509, was a Beach water lot, and included in the act of March 26th, 1851, to provide for the disposition of certain property of the State of California. An admission that lots, Nos. 509, 135 and 139, were sold by the sheriff in front of the Court House, and *not in view of the premises.*

The Acts of March 26th, 1851, (Water Lot Act,) April 15th, 1850, (to incorporate the City,) and April 15th, 1851, (to reincorporate the City.)

A map of the City, and an admission, that there was *de facto* an Ayuntamiento, and town or public organization of San Francisco at and before the year 1846 ; and which continued till the act incorporating the City, and that the map produced was prepared by said *pueblo,* and subsequently enlarged by the City, and is the one referred to in the deeds and statutes given in evidence. Also that prior to the deed of December, 1850, the City had claimed to own the lands described in the deed, and offered them for sale in lots as represented on the map.

The clerk of the Commissioners proved, that they had funded debts, and issued certificates to the amount of *$1,549,600 to* upwards of 400 persons; and that all the debts had not been funded.

The finding of the Superior Court as to the facts and law, and the judgment thereon, are set out at length in the opinion of the Supreme Court to which we refer.

A motion for a new trial was made by defendants' counsel and overruled.   And defendants appealed, 1st, from the order setting aside the report of the referee ; 2d, from the order refusing defendants a new trial; 3d, from the final judgment and decree.

The points made by the respective counsel in the argument, are specially stated and considered in the opinion of the Court, and it is therefore deemed unnecessary to repeat them here.

*Lockwood,* for appellant.

————, for respondent.

The opinion of the Court was delivered by Chief Justice MURRAY, with which ANDERSON, Justice, concurred.

This cause was tried by the Court below, setting as a jury, and the following verdict returned, viz.

"1st. The plaintiff recovered judgments against the city of San Francisco, as alleged in the complaint, supplemental and amended complaint, to wit:—The first, on the 25th day of February, 1851, in the sum of $19,592 with interest at the rate of three per cent. per month, and costs; the second, on the 4th day of March, 1851, in the sum of $45,548 82 with interest at the rate of three per cent. per month, and costs; the third, on the 6th day of September, 1851, in the sum of $13,900 with interest at the rate of three per cent. per month, and costs.

"2d. Transcripts of the first and second of these judgments were recorded and filed in the office of the recorder of deeds of the county of San Francisco, on the 14th of March, 1851; the third was duly docketed on the 6th day of September, 1851.

"3d. The demands upon which these several judgments were recovered, were subsisting liabilities on the 26th day of December, 1850, and a part of the judgment aforesaid, rendered on the 6th day of September, 1851, remains unsatisfied.

"4th. On the 26th day of December, 1850, the aggregate liabilities and indebtedness of the city of San Francisco, was over one million of dollars, and more than thrice as great as the estimated or actual amount of the revenues of said city; the city was then destitute of funds, and was unable to borrow money to pay its debts.

"5th. On the 14th day of June, 1851, the plaintiff became a *bona fide* purchaser under execution, at sheriff's sale, of the beach and water lot No. 509, and of the two upland lots Nos. 135 and 139, as mentioned in said complaints, and on the 18th day of July, 1851, he received from the sheriff a deed of conveyance for said lots, and became the owner of all the right, title and interest which the city of San Francisco had, in those lots, unencumbered and unaffected by the deed of conveyance or assignment, purporting to have been made by the city of San Francisco to the Commissioners of the Sinking Fund, on the 26th day of December, 1850, and unencumbered and unaffected by the deed of conveyance made by said Commissioners of the Sinking Fund on the 24th day of May, 1851, to the defendants, and unaffected by the act entitled "An act to authorize the funding of

the floating debt of the city of San Francisco," &c., passed May 1st, 1851.

" 6th. The deed of conveyance or assignment purporting to have been made by the city of San Francisco to the Commissioners of the Sinking Fund on the 26th day of December, 1850, and the deed of conveyance made by the Commissioners of the Sinking Fund on the 24th day of May, 1851, to the defendants mentioned in the pleadings, were made with intent to delay, hinder and defraud creditors.

" The Court being of opinion, upon the facts and the law, that the deeds last aforesaid, under which the defendants claim title to the property therein described, are null and void, as against the plaintiff, and are a cloud upon his title to the lots of land aforesaid, which ought to be removed; that they tend to depreciate the value and enjoyment of his property in said lots of land, and to embarrass him in enforcing execution of his judgment yet unsatisfied; and that they ought to be set aside, and declared to be of no force and effect; it was therefore considered by the Court, that the plaintiff do have judgment accordingly.   Whereupon it was ordered, adjudged, and decreed, that the deed aforesaid, made by the city of San Francisco, as aforesaid, to the Commissioners of the Sinking Fund on the 26th day of December, 1850, and the deed aforesaid, made by the ' Commissioners of the Sinking Fund' to the defendants, be and the same are hereby set aside, and declared to be null and void.   It is further ordered, adjudged and decreed, that the injunction hereinbefore granted against the defendants, be and the same is hereby made perpetual; and it is further ordered and adjudged, that the plaintiff recover his costs, &c., &c."

I shall pass over the objection raised upon the record, that the Court below erred in setting aside the report of the referee, as I conceive the filing of the supplemental bill and answer, by the defendants, cures that defect; and also, because the counsel have desired a decision upon the main questions involved in this case.

I shall take it as true, for it is alleged in the bill, and not denied in the answer, that the indebtedness to the plaintiff, on which judgments were recovered, was a subsisting liability on the 26th day of December, 1850.

On the same day, by virtue of an ordinance of the common council of San Francisco, all the real estate of San Francisco was transferred to the "Commissioners of the Sinking Fund," created by authority of the common council, and by them conveyed, on the 24th day of May, 1851, to the "Commissioners of the Funded Debt."

It is contended by the counsel for the appellant, that the 6th finding of the Court, viz.: "That these conveyances were made with the intent to hinder, delay, and defraud creditors," is erroneous; 1st. Because the City of San Francisco had power, under her charter, to sell and dispose of the property in question, and to create the sinking fund commission.

2nd. A corporation cannot commit a fraud, or do an act with a fraudulent intent.

3rd. The question of fraudulent intent, is a question of fact for the consideration of the jury; and the facts in this case do not support the finding of the Court; and 4th. That, admitting the deed to the commissioners of the sinking fund, was void, for fraud, or want of power on the part of the common council, to create such commission or *department*—still the whole is cured by the act of the legislature, May 1st, 1851, and all the previous acts of the common council, ratified and confirmed in that particular.

The duties and liabilities of corporations have become too well understood, to require this Court to enter into any lengthy discussion of their powers on disabilities; in a word, they are bound to follow strictly the letter of their charter; and can exercise no power, unless granted to them, or absolutely necessary to carry out the power so granted.

The first charter of the City of San Francisco, does not authorise the creation of a sinking fund commission *in terms*, neither is there any clause under which the power can be exercised, even by implication. The power to sell for the benefit of the city, does not include an authority to create a new department of city government, to divert the revenues and property of the city from their legitimate source, and place them in the hands of those, neither chosen by, nor responsible to the corporators of the city.

Again, the common council must exercise the functions imposed

upon them by their charter; and have no power to delegate them to others. The power to sell, granted to them, does not include the power to make a deed of trust, or place the property committed to their custody, in charge of others, for the term of three years, with power to sell, as *they* may *deem advisable.*"

I should not have resorted to any argument whatever, to sustain such propositions, were it not for the zeal with which the learned counsel urged this point, and the interests which are involved in an adjudication of the case. The conclusion to which I have arrived upon this point, viz., that the attempt of the common council to create the board of Sinking Fund Commissioners, and to transfer the property of the city, was an unwarranted usurpation of authority, and that the proceedings are void, so far as relates to that transaction, might very well justify me in passing over some of the points raised by the appellant.

But lest I should be mistaken in this proposition, I prefer considering them in their order.

What was the object of the City in creating this commission? the creation and promotion of City improvements? For this purpose, the Commissioners were authorized to issue bonds, to the amount of $800,000 with 2 per cent. interest per month, payable in one, two, and three years; and by the last ordinance, all lots and real estate of the City is set apart and held inviolate, for the payment of these bonds and interest upon them; and the Commissioners are authorized to dispose of said property by lease or sale, as in their judgment shall be most advisable.

To carry out these purposes, a deed was made to them. On the same day the debt of the City exceeded one million of dollars, more than three times its annual estimated revenue, and the plaintiff was at the same time one of its creditors.

Had this been the transaction of a private individual, attempting to place his property beyond the reach of creditors, yet reserving the benefit of it to himself, empowering his assignees to create new liabilities upon his own account, and delaying his honest creditors from making their money, unless the Commissioners thought proper to sell, no lawyer would have attempted to uphold it, in any court of justice. How then does this transaction vary from that of private individuals? The counsel for the appellant contends, " that a corporation cannot commit a

fraud, or do an act with a fraudulent intent." " A corporation cannot have the *animus lucrandi* to the fraudulent intent arrived at by our statute," says the learned counsel.

The Statute of Frauds was designed for the protection of the rights of the creditors, and is but an affirmance of the principles of the common law. Corporations are authorized to take and hold property as natural persons, and are to be governed by the laws of the land, in all particulars : no exception is made in favour of them in this respect by our legislature. The fact that no authority can be found to support the proposition, carries with it no conviction : the policy of the statute was to prevent such conveyances ; and it would certainly be a new and dangerous doctrine to establish, that municipal corporations might at any time defeat their creditors by a fraudulent assignment, and that the law had given them an immunity in these cases, greater than that allowed to private individuals, when, in truth, their powers are more limited than those of natural persons.

That an individual cannot commit a fraud because he is not to be benefited thereby, is certainly a novel proposition.

The act may be a fraud upon the rights of third persons, and it is not impossible to imagine a case in which the officers of a municipal corporation with or without any interest in the matter, may be guilty of a fraud upon the rights of others. If, however, there be any doubt on this subject, it is true, that doubt should be removed, and all metaphysical refinements, and fine-drawn distinctions of astute logicians, must yield to plain principles of sound morality and justice.

A corporation without soul, will, capacity to do wrong, or legal responsibility, is a legal monstrosity, whose existence no court ought to foster or protect ; and common justice requires that the rights of the creditor should be protected from every species of fraud, proceeeding from whatever source it may.

Neither can the force of this conclusion be diminished by the ingenious argument of the learned counsel, that the law punishes the act of making a fraudulent conveyance ; and that penal statutes must be strictly construed.

It may be true, that a corporation cannot be punished criminally ; but this forms no solid reason, why the law may not make reparation to the innocent, or secure the property of the creditor,

from the operation of a fraud, the commission of which it is unwilling or unable to prevent.

But it is said, admitting this proposition to be true, the question of fraudulent intent is a question of fact for the determination of a jury; and that there was no evidence to warrant the Court in finding the fact of fraud. The case of Billings v. Billings is relied on by the counsel for the appellant, and in justice to myself, having participated in that decision, I must say the learned counsel gives to it a construction never intended by the Court. In that case the Court say, " that although the question of fraudulent intent is made a question of fact in all cases, yet whenever the law declares that certain evidence is conclusive of fraud, a verdict against such conclusive evidence should, in all cases, be set aside." The counsel for the appellant contends, that this language means that the verdict will be set aside, when contrary to the evidence proving a fraud in fact. A sufficient answer is found in the following portion of the opinion. " On the other hand, where the evidence of fraudulent intent is declared by law to be only presumptive, the jury have power, upon considering the whole case, to find against such presumption, and the Court would have no right on that ground alone, to interfere with the verdict." Would not the converse of the proposition be equally true; and if the case were submitted upon the presumptive evidence of fraud, and the fact of fraud found, would the Court have any right to disturb it ? But say the Court, " The counsel for the appellant argued this cause upon the hypothesis that the District Court refused to decide, that the power to sell on credit was presumptive evidence of fraud. We cannot discover this by any thing in the record; if we did, we would not hesitate to reverse the judgment. The requests to the Court below are each accompanied with the same commencement, which asks the Court to decide that these assignments are void; holding as we do, that the power to sell on credit is not conclusive, but only presumptive evidence of fraud, it follows that the Court correctly refused to decide, that the deed was void on that ground; and the Court having also, in the capacity of a jury, passed upon the facts, and found against the presumption of fraud, there is no error."

The statute no where declares what will be conclusive or presumptive evidence of fraud. Where, then, are we to look for a

definition? Certainly to the books. The rule of the English statute, which was only declaratory of the common law, is not changed by our law, except so far as it devolves, what was the duty of the Court, upon the jury.

It is impossible to imagine two cases more similar, than the present and the one just quoted, with the single exception, that the deed of conveyance in this case, bears upon its face conclusive evidence of fraud.

If we could not set aside the verdict in the case of Billings v. Billings, where there was acknowledged presumptive evidence of fraud, because the Court, setting as a jury, had found against the presumption, how can this Court properly set aside the verdict of the Court in this case, when it has found in favour of the presumption?

I have thus attempted to demonstrate that the conveyance to the Commissioners of the Sinking Fund, created by the common council, was void. 1st. For want of power in the council to organize such commission, or make such conveyance in trust. And 2nd, because said deed was within the statute of frauds. From which it follows, that the plaintiff's judgment became a lien upon the property of the city.

But it is contended if this should be the case, all these informalities, defects, and frauds, have been confirmed and ratified by an act of the legislature, passed May 1st, 1851, entitled, "An Act to fund the floating debt of San Francisco."

In support of the proposition that the legislature may confirm a void or fraudulent grant, a number of authorities have been cited, which I propose briefly to review.

In the case of Wilkinson v. Leland, 2 Peters, 672, the legislature of Rhode Island confirmed a void deed made by an executrix. It appears from the decision of the Court, that the property of the deceased, by the laws of Rhode Island, was liable for his debts. The executrix, residing in New Hampshire, had proceeded under the laws of that State, and had exhausted the property belonging to the estate, in New Hampshire, and afterwards sold the remaining property of her husband, lying in Rhode Island. At the time of said sale, she entered into an agreement with the purchasers of said property, to have said sale confirmed by the legislature of Rhode Island; as it was well

understood the same was invalid, unless the will was admitted to probate, and the order of sale made by the courts of Rhode Island. Accordingly, a petition stating the facts, and also, that the sale of said property was necessary for the payment of the debts of the estate, and praying for a confirmation of said sale, was presented by said executrix, and the prayer granted by the legislature. The heirs of Cynthia Jenks afterwards brought ejectment. It was contended that this act was unconstitutional, and divested vested rights. The legislature of Rhode Island, acting under a charter granted by Charles the Second, had, at times, exercised all the powers of government—legislative, judicial, and executive; and, as was shown on the argument, had been frequently in the habit of granting new trials, and confirming void acts. Under the laws of Rhode Island, power to sell was granted, as a matter of course, without notice to heirs or devisees, on the mere production of proof from the Probate Court, of the deficiency of personal assets. A purchaser at the sale, upon receiving a deed from the executor or administrator, had a complete title, and was immediately under the deceased, and could enter and recover, notwithstanding any intermediate descents, sales, disseisins, or other transfers of title or seisin.

If therefore say the Court, " the whole real estate be necessary for the payment of the debts, the whole is sold, and the title of the heirs or devisees is by general operation of law divested and superseded.

"From this it appears, that the devisee under whom the present plaintiff claims, took the land in question, subject to the debts of the testator ; her estate was a defeasible estate, subject to be divested. They have been divested of their formal title in another manner, in favour of creditors entitled to the estate, or rather their formal title has been made subservient to the paramount title of creditors. It is said this act divests, vested rights of property; but it has been already shown, that it divests no such rights, except in favour of existing liens, and that the estate was vested in the devisee expressly subject to said rights."

The Court further says, there is no pretence of fraud in the case, and although the law requires no notice, still it would be better in all such cases that notice should be given; but notice may be presumed after thirty years' acquiescence. How then

does this case sustain the proposition contended for ?    Speaking upon the subject of divesting vested rights, in the same opinion the Court holds this strong language.  " By the charter of Rhode Island the power to make laws is granted to the general assembly in the most ample manner, ' So as such laws be not repugnant unto, but as near as may be agreeable to, &c., the laws of England, considering the nature and constitution of the place and people therein.'   In a government professing to regard the great rights of personal liberty and property, and which is required to legislate in subordination to the laws of England, it would not lightly be presumed the great principles of Magna Charta were to be disregarded, or that the estates of its subjects were to be taken away without trial, without notice, or offence even, if such authority could be deemed to have been granted by the charter of Rhode Island as an act of transcendental sovereignty before the Revolution.    It can scarcely be supposed, that that great event left the people of that State, subject to its uncontrolled and arbitrary exercise.    That government can scarcely be said to be free, where the rights of property are left solely dependent on the will of the legislative body without any restraint.

" The fundamental maxims of a free government seem· to require, that the rights of personal liberty and private property should be held sacred, *at least no court of justice*, in this country, would be warranted in assuming that the power to disregard them—a power so repugnant to common principles of justice and civil liberty, lurked under a general grant of legislative authority, or ought to be implied from any general expression of the will of the people.    The people ought not to be presumed to part with rights so vital to their security and well-being, without very strong and direct expressions of such intention.    It has been held by this Court, that a grant of land made to a person or corporation, is irrevocable, and cannot be resumed by any subsequent legislative act ; and that a different doctrine is utterly inconsistent with the great and fundamental principles of republican government, and with the right of the citizens to the free enjoyment of their property lawfully acquired.

" We know of no case in which a legislative act to transfer the property of A. to B. without his consent, has ever been held a constitutional exercise of legislative power in any State of the

Union. On the contrary, it has been constantly resisted, as inconsistent with just principles in every tribunal in which it has been attempted to be enforced. We are not prepared, therefore, to admit that the people of Rhode Island have ever delegated to their Legislature the power to divest vested rights of property, and transfer them without the assent of parties. *The counsel for the plaintiffs have admitted themselves, they cannot contend for such doctrine."*

The next case relied upon, is the case of Saterlee v. Matthewson, 2 Peters. I have examined this case, as reported in 13th Sergeant and Rawle. This was an action of ejectment, brought for lands in Pennsylvania, originally obtained under a Connecticut title, and leased by the plaintiff to the defendant's father, in 1790; afterwards, in 1795, the legislature passed an act, declaring all contracts founded on Connecticut titles, void; and made it a criminal offence, to intrude under such titles.

In 1813, the plaintiff brought ejectment, and recovered; but the judgment was reversed in the Supreme Court, on the ground that the lease being founded on a Connecticut title, was void; afterwards, the legislature passed an act, declaring that the relation of landlord and tenant should exist upon such titles; and the Supreme Court of Pennsylvania affirmed the plaintiff's judgment, on the ground that the first law was passed after the contract of lease, and the disability created by such act, had been removed by the passage of the Act of 1826, and the parties remitted to their original rights: here the obligation of no contract was impaired, and the Supreme Court of the United States merely decided, so far as this case goes, that there is no *provision* of the Constitution of the United States, which prohibits States from passing laws divesting vested rights.

The case of Watson v. Mercer, 8th Peters, arose under a statute of Pennsylvania, confirming all defective acknowledgments of deeds. It was contended that this law divested vested rights, and impaired the obligation of contracts. But the Supreme Court of the United States again decided that there was no constitutional prohibition upon States passing such laws, unless they impaired the obligation of contracts; and that a law could not fairly be said so to do, which created a new, or confirmed an imperfect one. It was, in fact, but changing a rule of evidence—

35

there was no dispute as to the fact of the contract; and it was perfectly within the power of the legislature to say, that such acknowledgment should be good evidence of the acts of the parties.

In regard to private acts of parliament, and acts of alienation, Blackstone says, in vol. 2nd, chapter 21st: "Acts of this kind are however carried on in both houses, with great deliberation and caution, particularly in the House of Lords; they are usually referred to two judges, to examine and report the facts alleged, and to settle all technical forms; nothing is done without the consent expressly given of all parties in being, and capable of consent, that have the remotest interest in the matter, unless such consent shall appear to be perversely withheld; and a general saving is added at the close of the bill, of the rights and interests of all persons whatever, except those whose consent is given or purchased, and who are therein particularly named; though it hath been held, if such saving be omitted, it shall bind none but the parties."

In Cruise's Digest, vol. 5, p. 31, it is said that those acts are looked upon as private conveyances, rather than as the solemn acts of the legislature, and have been relieved against, when obtained upon fraudulent suggestions, and have been held void, if contrary to law and reason."

Chancellor Kent, in Chaplin v. Jackson, 8 Johns. Rep., says, when the suggestions on which the act is passed, are proved fraudulent, a court of chancery will relieve against them. In Watkins v. Holman, 16 Peters, the Court say, "If the administratrix and Brown have acted fraudulently in procuring the passage of the act, or in the sale under it, relief may be given on that ground." Here then is the whole doctrine upon this subject, both in England and the United States; from which it appears that Parliament which is said to be omnipotent, never affects the rights of third persons by such acts, and that unless entered into with good faith, and notice to all concerned, they are not binding.

But admitting for the present, that the Legislature have power to pass laws divesting vested rights, have they done so? and can their intention to confirm the void acts of the Common Council,

and the deed to the Commissioners of the Sinking Fund, be fairly inferred from the language of the act ?

The counsel for the appellant contends, that no express words are necessary to express a confirmation, and in support thereof, cites Comyn's Digest, and the case of Wilkinson *v.* Leland. Comyn, in speaking of confirmations between private individuals, uses the illustration quoted by the counsel.  "If I say ' *volo quod a habet,*' this is a sufficient confirmation."  In Wilkinson *v.* Leland, it was urged by Mr. Webster, that the Legislature of Rhode Island, if acting as a court, should have used the language of a court, whereas they had resorted to that of a legislative body ; and it did not sufficiently appear, that they intended to confirm the deed in question, but the Court say, "This is a legislative act, and must be interpreted according to the intention of the Legislature, apparent on its face; every technical rule of construction as to the force of particular terms, must yield to the paramount will of the Legislature, apparent on its face."

In this case the "*volo ut a habet*" of confirmations *inter partes* is nowhere expressed, neither can the intention of the Legislature to confirm these void acts be deduced by any fair rule of inference from the act reincorporating the city, or providing for funding its floating debt.  The 14th section of the third act of the amended charter provides, that "all moneys derived from the following sources, shall continue to constitute a Sinking Fund."

Section 15.  "The creditors of the city may fund the debts due them, &c."

Section 17.  "The Commissioners of the Sinking Fund are prohibited from disposing of any property, *belonging* to the city, by lease or sale; and are required, on or before the 1st day of May next, to reconvey and deliver all property, rights, titles, and interest, belonging to the city, which are or may be in their possession."

The 12th section of the act to fund the floating debt "requires the Commissioners of the Sinking Fund to transfer to the Commissioners of the Funded Debt all property, &c., belonging to said city, which they have or may hereafter receive by virtue of article 3d of an act, entitled 'An act to reincorporate the city of San Francisco,' approved 14th April, 1851."  What property did the Commissioners of the Funded Debt receive by the 3d article

of the charter, or what was confirmed to them? No interest whatever. "*The paramount will of the Legislature expressed upon its face*," confirming these acts, nowhere appears. On the contrary, if contemporaneous legislative exposition be entitled to any weight, it is clear that the Legislature never meant a confirmation; for, on the 28th of April, an act was passed confirming in express terms a contract entered into by these same commissioners for building Broadway wharf; on the 25th day of April, for building Market street wharf; and on the 5th day of April, for constructing the plank road to the mission of Dolores.

It appears from these acts, the Legislature understood the nature and form of confirmatory statutes, and it is hardly to be supposed, that in a matter involving so great an amount, as well as the rights of third persons, if they had designed a confirmation, they would not have expressed it in unmistakable language.

I can see no other object that the Legislature had in view, but to remove any legal doubt, as to the authority of one board of trustees to transfer to another board: and cannot presume the Legislature ever intended to usurp the functions of another branch of the government, by declaring that a fraud did not exist, or to interfere with the rights of third persons, unless express language be used to that effect.

But if I should be mistaken upon this point, it is still contended by the respondent, that the act of May 1st is unconstitutional, because it impairs the obligation of contracts. The decisions upon this point are by no means clear, and it is sometimes a difficult matter to distinguish between the right and the remedy. A law which creates a contract, it is said, cannot properly be said to impair the obligations of contracts. This is true, so far as it does not affect the rights and contracts of third persons. So the Legislature may, from time to time, alter or change the remedy; this they may do, provided they do not materially affect the right; but whenever the Legislature so far alter the remedy as to impede, destroy, change, or render the right scarcely worth pursuing, they necessarily impair the obligation of the contract upon which such right is founded, and the act is unconstitutional and void.

The leading cases on this subject are those of Bronson *v.* Kenzie, 1 Howard, and McCracken *v.* Hayward, 2 Howard.

The construction given to this clause in the Constitution, by the Supreme Court of the United States, has been adopted by the various State Courts, and is binding upon this Court.   In this case the Legislature of Illinois passed a law subsequent to the execution of a mortgage, which declared that the equitable estate of the mortgagor should not be extinguished for twelve months after a sale, under a decree in chancery, and which prevented a sale, unless two-thirds of the amount for which the property was appraised, should be bid at the sale.

This cause was carried to the Supreme Court of the United States, on the ground that it impaired the obligation of contracts, and the act of the Illinois Legislature was held unconstitutional and void.   In passing upon this case, the Court say, " If the laws of the State passed afterwards had done nothing more than change the remedy upon contracts of this description, they would be liable to no constitutional objection.   For, undoubtedly a State may regulate at pleasure the modes of proceeding in its courts in relation to past contracts, as well as future.   It may, for example, shorten the period of time in which claims shall be barred by the Statute of Limitations."

" Whatever belongs merely to the remedy may be altered, according to the will of the State, provided the alteration does not impair the obligation of the contract.   But if that effect is produced, it is immaterial whether it is done by acting on the remedy or directly on the contract itself; in either case it is prohibited by the Constitution."

" If these acts so change the nature and extent of existing remedies as materially to impair the rights and interests of the owner, they are just as much a violation of the compact, as if they directly overturned his rights and interests."

" But it is manifest that the obligation of the contract, and the rights of a party under it, may, in effect, be destroyed by denying a remedy altogether; or may be seriously impaired by burdening the proceedings with new conditions and restrictions, so as to make the remedy hardly worth pursuing.   And no one, we presume, would say, that there is any substantial difference between a retrospective law declaring a particular contract or class of contracts to be abrogated and void, and one which took away all

remedy to enforce them, or encumbered it with conditions that rendered it useless or impracticable to pursue it."

"This brings us to examine the statutes of Illinois, which have given rise to this controversy. As concerns the law of February 19th, 1841, it appears to the Court not to act merely on the remedy, but directly upon the contract itself, and to engraft upon it new conditions, injurious and unjust to the mortgagee. It declares, that although the mortgaged premises should be sold under the decree of the court of chancery, yet, that the equitable estate of the mortgagor shall not be extinguished, but shall continue for twelve months after the sale : and it moreover gives a new and like estate, which before had no existence, to the judgment creditor, to continue for fifteen months. If such rights may be added to the original contract, by subsequent legislation, it would be difficult to say at what point they must stop."

"This law gives to the mortgagor and to the judgment creditor, an equitable estate in the premises, which neither of them would have been entitled to, under the original contract; and these new interests are directly and materially in conflict with those which the mortgagee acquired when the mortgage was made. Any such modification of a contract, by subsequent legislation, against the consent of one of the parties, unquestionably impairs its obligations, and is prohibited by the Constitution."

In the case of McCracken v. Hayward, 2nd Peters, it was decided that a law of Illinois, providing that property should not be sold at sheriff's sale, unless it brought two-thirds of its valuation, according to the opinion of three householders, was unconstitutional and void: in that case the Court say, "In placing the obligations of contracts under the protection of the Constitution, its framers looked to the essentials of the contract, more than to the forms and modes of proceeding, by which it was to be carried into execution: annulling all State legislation which impaired the obligation, it was left to the States to prescribe and shape the remedy to enforce it. The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence where it is made; these are necessarily referred to in all contracts, and forming a part

of them, as the measure of the obligation to perform them by the one party, and the right acquired by the other.   There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicate, according to their settled legal meaning; when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other the right to enforce the performance by the remedies then in force.   If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract in favour of one party, to the injury of the other; hence, any law, which, in its operation amounts to a denial, or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the Constitution."

" The obligation of the contract between the parties, in this case was, to perform the premises and undertakings contained therein; the right of the plaintiff was to damages for the breach thereof, to bring suit and obtain a judgment, to take out and prosecute an execution against the defendant till the judgment was satisfied, pursuant to the existent laws of Illinois."

" These laws giving these rights, were as perfectly binding on the defendant, and as much a part of the contract, as if they had been set forth in its stipulations in the very words of the law, relating to judgments and executions.   If the defendant had made such an agreement as to authorize a sale of his property, which should be levied on by the sheriff, for such price as should be bid for it at a fair public sale on reasonable notice, it would have conferred a right on the plaintiff, which the constitution made inviolable; and it can make no difference, whether such right is conferred by the terms or law of the contract.   Any subsequent law which denies, obstructs or impairs this right, by superadding a condition, that there shall be no sale for any sum less than the value of the property levied on, to be ascertained by appraisement, or any other mode of valuation than a public sale, affects the obligation of the contract as much in the one case, as the other; for it can be enforced only by a sale of the defendants' property, and the prevention of such sale is the denial of a right.

" The same power in a State Legislature may be carried to any

extent, if it exists at all; it may prohibit a sale for less than the whole appraised value, or for three-fourths or nine-tenths, as well as for two-thirds; for if the power can be exercised to any extent, its exercise must be a matter of uncontrollable discretion in passing laws relating to the remedy, which are regardless of the effect or the right of the plaintiff."

This same question was afterwards considered by the Supreme Court of New York, in the case of Quackenbush v. Dowks, 1 Denio, in which it was held, that a law of New York exempting property from distress for rent and sale on execution, did not affect executions for debts contracted before its passage, and that said law conflicted with the Constitution of the United States prohibiting any State from passing laws impairing the obligation of contracts. Chief Justice Bronson, in delivering the opinion of the Court, says, "Imprisonment as a means of enforcing the payment of debts no longer exists. The creditor can look to nothing but the property of the debtor. If the Legislature can deprive him of the right to reach property—a right which existed at the time the contract was made—it is evident that nothing will then remain of the obligation of the contract beyond an empty name. It may be moral, but it is no longer the legal duty of the debtor to pay. For all honest and practical purposes, the Legislature might just as well say, that the debt shall be blotted out, as to deny to the creditor all means of enforcing payment. I have not overlooked the distinction, which often exists between the obligation of the contract, and the remedy to enforce performance. In many cases, this distinction is of a substantial nature, and must have a controlling influence. But experience has proved that laws which in form go only to the remedy, may have the practical effect of nullifying the contract. This has been seen by the Federal Courts, and they have recently laid down some very important qualifications to the general doctrine, that the States have unlimited power over the remedy. I shall not enter at large into the discussion of this question, for the reason that, I think it virtually settled by the late decisions of the Supreme Court of the United States, in the cases arising under the valuation laws of the State of Illinois, (Bronson v. Kenzie, 1 Howard, 311; M'Cracken v. Hawyard, 2 id. 608.) I allude more particularly to the last of these cases, which arose

upon a statute touching sales on execution. The laws provided that when execution should be levied on any property, real or personal, it should be the duty of the officer to summon three householders, who, after being duly sworn, should 'fairly and impartially value the property;' and when offered for sale, it should not be struck off, unless two-thirds of the amount of such valuation should be bid therefor. This law which was passed after the creditor had obtained a judgment, was held to be unconstitutional and void. If a law which only prohibits the creditor from taking the property at less than two-thirds of its sworn value, cannot be supported, it needs no argument to prove that a law cannot be upheld, which wholly withdraws the property from the reach of the creditor. As the question arises under the Constitution of the United States, we must regard the decision as one of binding authority."

There is, I think, no well defined middle ground, between holding, that none of the debtor's property can, by a subsequent law, be withdrawn from the reach of the creditor, or else, admitting that the whole of his estate may be exempted from sale on execution. In the case before us, the exemption law saves all to the debtor; but my opinion would be the same, if it had only saved a part. Such property as was subject to execution at the time the debt was contracted, must remain subject to execution, until the debt is paid. As to future obligations, the legislature may make the exemption as broad as it pleases. It may abolish credit altogether, but it cannot legislate backward, and annul the force of prior obligations."

If an act, which gives to the mortgagors the right to redeem in twelve months, or provides that property shall not be sold for less than two-thirds of its value, or which exempts the necessary property of the poor and indigent, is unconstitutional, how much more so is an act which divests the creditor's lien altogether? Which exempts the property of the judgment debtor from execution, places it in the hands of trustees, with power to sell, as they may think proper, and compels the creditor, if he wishes any benefit whatever, to fund his scrip at a less rate of interest, and submit to the delay of twenty years, without any guaranty that he will then receive the principal. Such are the provisions of the act to fund the indebtedness of the city. The property

out of which the creditor had a right to make his money, is attempted to be withdrawn, and the remedy he possessed so far impaired, as to make his right worthless.

The law, therefore, is unconstitutional and void, as against the plaintiff in this case.

It has, however, been contended, that if the Court should come to the conclusion to which it has now arrived, that the Act of April 15th, 1851, re-incorporating the City of San Francisco, repealed the old corporation, and consequently its debts became extinguished, and its property escheated to the State. That the State, in the exercise of her sovereignty, has reconveyed the property of the city to the fund commissioners, coupled with the condition of the payment of the floating debt of the city.

It requires no little courtesy to discuss this proposition seriously, even for a moment; and the whole mistake has grown out of a failure to distinguish the difference between the body politic, as a corporation, and the act constituting it a corporation. The title of the act is, "An Act to re-incorporate the City of San Francisco." The first section provides, "The people of the City of San Francisco *shall continue* to be a body politic and corporate, under the name and style of the City of San Francisco."

By the first charter, the people of San Francisco are constituted "a body politic;" the second continues, not destroys, the body so founded.

In the language of Lord Mansfield, "It has never been disputed, that new charters revive, and give activity, to the old corporation; where the question has arisen, in which there was any remarkable metamorphosis, it has always been determined that they remain the same, as to debts and rights." Angell & Ames on Corporations, 780; Hopkins *v.* Swansea, 4 M. & W. In the case of Bellows *v.* The President, Directors, and Company of Hallowell and Augusta Bank, Judge Story lays down the rule, that we must look to the terms of the charter, to ascertain whether a new corporation is created, or merely an old one continued. In fact, the legislature possess no such arbitrary power, to seize the revenues and property of a municipal corporation. If they had, by what authority, the debt having once been destroyed, can they again revive, and impose it upon this city? and

authorize a large tax to be levied upon the corporators, for its payment?

The construction contended for is at war with the plain and obvious meaning of the Legislature, and even if such were the intention, it would be but doing indirectly what I have already shown they cannot do directly, and would therefore be unconstitutional and void.

It was contended upon the argument of this case, that the City of San Francisco had no title to a portion of the property in question. It is admitted in the agreed case, that the title was in the City so far as the question of the right to sell the water property of the City is concerned. The City is estopped from setting up any right in the State. She cannot take advantage of her own wrong by showing an indebtedness to the State. The Sheriff merely sold the right, title and interest of the City. And whenever the State chooses to assert her right in the premises, it will be time enough for this Court to determine the character of the title which the plaintiff acquired.

The next objection taken by the appellant, is to the mode of levy and sale of the water lots in question. It is contended, that the City never had any thing but a leasehold interest in the water lot property; that the judgment is not a lien; and the Sheriff cannot levy upon it, without an actual mancaption or seizure; that he must levy and sell it as a chattel, within view of those attending, and deliver possession to the purchaser.

At common law, the mode of selling chattels personal and chattels real was essentially different. In the first place, personal chattels were sold in view of the purchaser, and he was immediately put into possession of them.

In the sale of chattels real, the sheriff executed a deed, and the purchaser was left to his remedy at law to obtain possession. Playfair v. Musgrove, 14 Mees. & Wels.; Rex v. Dean et al, 2 Shower.

By the Statute of 1850, under which the sale was made, the mode of selling chattels real and personal is not the same, whilst that of selling chattels real and real estate is. Sect. 172, chap. 25, Statutes of 1850, provides that the filing of a judgment with the Recorder of a county shall create a lien upon all the real estate of the judgment debtor, within the county in which the

transcript is so filed.   Sect. 181, provides that an execution shall create no lien upon personal property, except upon personal property actually levied upon.   Sect. 190, provides for the judgment debtor giving bond for the forth-coming of the personal property.   Sect. 196.  " No personal property shall be offered for sale unless the same be present and within view of those attending the sale, provided, &c."

The 197th section provides, when real estate " has been taken in execution, it shall be sold at the county-seat of the county in which it is situated, at the door of the Court-house :"  Sect. 207, " The officer who shall sell any real estate or lease of lands for more than one year; shall make to the purchaser a deed reciting the facts, &c."   The deed shall convey to the purchaser all the right, title and interest which the defendant had at the time of filing the transcript in the Recorder's Office, &c."

From these sections, it is evident that personal property must be actually seized and sold in presence of the purchaser ; while a lien immediately attaches to real estate, upon the filing of the transcript, and that the same is to be sold in front of the court house door, and that all leasehold estates, of more than one year, are to be so disposed of.   In fact, from the very nature of such estates, it would be a moral and physical impossibility to levy upon and sell them in the mode pointed out, in regard to personal property; to attempt which, would involve an absurdity never contemplated by the law.

It is said that the clerk had no authority to issue the writ of *venditioni exponas*, and the sheriff had no authority to sell under it.

The execution first issued in this case, was a perfect power to the sheriff to sell, and when he levied, the property so levied on, was in legal contemplation in his possession, and it was his duty to sell; if he did not sell before the return, it was nevertheless his duty to sell.   The writ of *venditioni exponas*, at common law, gave the sheriff no new power, but compelled him to proceed on motion of the plaintiff.   This writ, or order, was a common law right of the plaintiff, (2 Tidd, 1020.)   It is even said, if the sheriff seize sufficient property, and return the writ, he is bound to find buyers.   The sheriff may also sell, after he goes out of office, upon an old and expired levy, made while in office, without

a *venditioni exponas,* (ibid. 1013,) and the authorities there quoted.

If such were not the case, any informality in this respect is cured by the 8th, 9th, and 10th sections of the act to regulate proceedings in the district courts.   Statute 1850, p. 24, which authorize the Court to "frame new writs and process, and to issue all such executions and other writs, as may be necessary to carry their judgments into full force and effect."

I have thus attempted to demonstrate that the act of the City of San Francisco, creating the "Board of Sinking Fund Commissioners," and the deed executed to them, of all the property of the city, is void, for want of power in the city, and also, because said deed is within the statute of frauds.

That the Act of May 1st, funding the debt of the city, is unconstitutional, so far as the rights of the plaintiffs are affected thereby, and that the levy and sale by the sheriff, are regular and valid.

Whether this be a controversy between speculators at the sheriff's sale and the city, as urged by the appellant's counsel, is a matter with which this Court has no concern.

The plaintiff was an honest creditor of the city, and as such, entitled to be paid: if, in attempting to shuffle off this debt, the city has lost her patrimony, the censure must fall on those who have permitted so great a sacrifice.   This Court cannot warp the stern rules of law, to relieve against the apparent hardship of the case, or to defeat rights properly and legally acquired.

Judgment affirmed, with costs.

A motion was made for a re-hearing, which was overruled, and the judgment affirmed in all particulars.