Ferry v. Laible.

---

EBENEZER L. FERRY and WILLIAM H. AKIN

v.

JOHANNA LAIBLE and others.

1. When the creator of a power prescribes the method of its execution, that method must be strictly pursued, so far, at least, as may be necessary to give effect to the creator's purpose.

2. A power to sell lands does not authorize the making of a mortgage.

3. Where a testator directs his executors to continue his business, and they incur debts in its prosecution, so much and no more of his assets

Ferry *v.* Laible.

as he has directed should be embarked in business, will stand charged in equity for the payment of the debts of the business.

4. Creditors have a right in the first instance, without first exhausting their remedy against the executors personally, to have recourse to the trade property.

5. In determining what part of his estate he intended so to embark, everything should be understood to have been included, which is reasonably and fairly necessary to the full accomplishment of the testator's scheme.

6. A testator, by a direction to continue his business, creates a trust estate which the court will keep separate and apply exclusively to the purposes of the trust.

7. If executors, carrying on business pursuant to the direction of the will of their testator, misappropriate the trade assets in the erection of buildings on lands of the testator not embarked in the business, a court of equity may, according to established methods of procedure, compel restitution of such assets, either by directing payment or a sale of the land.

On final hearing on bill, cross-bill, answers and proofs.

*Mr. A. Q. Keasbey,* for complainants.

*Mr. T. N. McCarter,* for the executrix of John Laible Jr., deceased.

*Mr. William H. Morrow,* for August Stengel and others, defendants.

NOTE.—An executor, as such, has no power to mortgage the lands of his testator (*Ford* v. *Russell, Freem.* (*Miss.*) *Ch. 42*) ; nor an administrator (*Green* v. *Sargeant, 23 Vt. 466*); nor a substituted trustee (*Tyson* v. *Latrobe, 42 Md. 325 ; Belote* v. *White, 2 Head 703*) ; nor can an executor take lands in payment of debts due to his testator (*Allen* v. *De Witt, 3 N. Y. 276 ; Weir* v. *Humphries, 4 Ired. Eq. 264;* nor convey lands to pay testator's debts (*Russell* v. *Russell, 36 N. Y. 581;* see *Goode* v. *Comfort, 39 Mo. 313 ; Close* v. *Van Husen, 19 Barb. 505*) ; nor is mortgaging the natural way of paying debts (*Andrew* v. *Wrigley, 4 Bro. C. C. 138*).

In the following cases a power to sell land has been held to include the power to mortgage:

*Earl of Oxford* v. *Earl of Albermarle, 15 Jur. 811,* on a trust " to sell and dispose of all and singular, the same hereditaments and premises,

37

Ferry *v*. Laible.

THE VICE-CHANCELLOR.

This suit grows out of an attempt by a testator to continue his business after his death, and to control its conduct by his will. Vice-Chancellor Shadwell once remarked that every testator, by the law of the land, was at liberty to adopt his own nonsense in disposing of his property. The will brought in judgment in this case, presents a very forcible example of the extent to which it is possible for a testator to carry the exercise of this privilege.

·John Laible, a brewer, of the city of Newark, died August 21st, 1862. He left a will, by which he gave his widow " the use, improvement and income of his real estate, houses and lots," during her widowhood; and, also, " all his personal property, household furniture and clothing, except all things belonging to the brewery business, to have and to hold the same to her, her heirs and assigns forever." He further directed that his son John should be the exclusive manager of his brewery business; but if it should be found, within one year, sooner or later, that, through John's neglect, wrong or default, debt had been made, or loss sustained, then the business should be let out or sold, just as his executors, with the consent of his widow, should see fit. The will also directed that John should receive, as

either together or in parcels, and either at public auction or by private contract," and to invest the surplus, after paying encumbrances.

*Duval's Appeal, 38 Pa. St. 112*, a devise of a residue of lands to be sold at public or private sale, the proceeds to be applied to the payment of debts not otherwise provided for, and the surplus to be divided among testator's children, authorizes a conveyance to the executrix to enable her to mortgage the property conveyed, in order to raise money to pay debts.

*Britton* v. *Lewis, 8 Rich. Eq. 271,* " to sell all my visible property in such manner as they (the executors) shall think most advantageous; out of the proceeds I wish my debts to be paid, and the rest I give to my children."—*Held*, to authorize a sale and the taking of a mortgage for the entire purchase-money. Also, *Sollee* v. *Croft, 7 Rich. Eq. 34.*

*Bogert* v. *Hertill, 4 Hill 492,* " for the more easy and equal division of my estate, I do hereby fully authorize and empower my executors hereinafter named, whenever they shall think it expedient, to sell and dispose of all or any part of my real estate for the most moneys that can be gotten for the same, &c."—*Held*, that a sale of part of the lands and

Ferry *v.* Laible.

compensation for his services as manager, five per cent. on the amount of annual sales; also, that he should receive, for spending-money, one cent from every dollar's worth of beer sold; and, also, that he should have his fuel furnished without charge, and a dwelling-house free of rent. It also provided, that if the brewery business should be well managed, and have good progress, it should be sold to his sons John, Philip and William, for a reasonable price, when the two latter attained the age of nineteen years; and that, in case of his widow's death before Philip and William attained the specified age, John was to be associated with the remaining executors in the conduct of the brewery business. Power was given to his executors to invest the interest or profits which they should receive from the brewery business, on bond and mortgage, or in the purchase of real estate; but if they determined to purchase real estate, they were not to purchase anything unless they could pay cash for the whole. The will then added: "And they shall also have the power to sell, but in all such transactions the hereinafter-named executors and my wife, Johanna, shall all agree in such transactions." A legacy of $1,000 is given to one of his eight children, and $1,250 to each of the other seven. The will also provides that, in case the widow shall marry again, she shall receive $500

taking a bond and mortgage for the purchase-money, was valid, and also one executor's assignment of the mortgage. See *Leggett* v. *Hunter,* *19 N. Y. 445; Mathews* v. *Dragaud, 8 Desauss. 25.*

*Campbell* v. *Low, 9 Barb. 585,* a deed of trust gave to the *cestui que trust,* a married woman, full power of disposition ("to convey and assure") of the estate, with her husband's assent.—*Held,* that a mortgage was a good execution.

*Wayne* v. *Myddleton, 2 Ga. 383,* a trust deed authorized a married woman, by and with the consent of her trustee, to sell and dispose of the trust estate whenever she deemed proper, and to re-invest the proceeds upon like trusts.—*Held,* to justify a mortgage to secure part of the purchase-money of lands and slaves bought by her. *Peace* v. *Spierin, 2 Desauss. 460; Short* v. *Battle, 52 Ala. 456; Sampson* v. *Williamson, 6 Tex. 102.* Contra, *Marvin* v. *Smith, 56 Barb. 600; Head* v. *Temple, 4 Heisk. 34; Leavitt* v. *Pell, 25 N. Y. 474; Hoggatt* v. *White, 2 Swan 265.*

*Zane* v. *Kennedy, 73 Pa. St. 182,* "to sell and convey, by all lawful assurances and conveyances, all or such parts of the said hereby-granted estate, as the said M. shall, by writing, under her hand, request, &c."

each year thereafter, but her husband shall be considered as if he was not in existence, and then adds: " If my widow should die as my widow, then the real and personal property then remaining shall go to my grandchildren. I do hereby order that there shall be no difference between my children now in existence." No further or other gift or disposition is made. The widow and two other persons were appointed executors, and, by the clause appointing them, this power is added: "And I do hereby authorize and empower my executors to make purchases or sales in the above-stated cases."

Though the obscurity which covers some of the testator's purposes is so dense as to defy all efforts to penetrate it, still, I think it is very clear that he intended his business to be continued after his death. There can be no doubt that his directions to that end were sufficiently plain and positive to justify his executors in permitting it to be continued. It was continued for nearly ten years. For more than half that period it was carried on prosperously. It was also largely increased in volume. A part of the profits were used in erecting new and larger and more substantial buildings on the brewery premises, and in enlarging and improving the means of conducting the business. The sum expended for these purposes is estimated at $50,000. At

In the following cases, in addition to those referred to in the opinion, such power has been held not to include the power to mortgage:

*Page* v. *Cooper, 16 Beav. 396,* " to sell and dispose " [of lands] and out of the proceeds " to levy, raise and pay " two sums, and to invest the residue for two persons for life, with remainder to their children.

*Wood* v. *Goodridge, 6 Cush. 117,* a power to buy and sell real and personal property, and to execute and deliver deeds to transfer the same, &c., &c. Also, *Morris* v. *Watson, 15 Minn. 212.*

*Albany Fire Ins. Co.* v. *Bay, 4 N. Y. 9,* a trust of lands " to sell and dispose of such parts, in fee-simple *or otherwise,* as T., by writing, under her hand, should from time to time request or desire."

*Coutant* v. *Servoss, 3 Barb. 128,* a trust of lands " to grant, bargain, sell and convey those lots, or any part thereof, for such sum or sums, and at such times, as to him should seem proper, and to make and execute all necessary conveyances in the law for the same, for the benefit of said infants."

*Tyson* v. *Latrobe, 42 Md. 325,* " to sell and dispose of the trust property

Ferry v. Laible.

the time of the testator's death, his business was mainly carried on ou a lot one hundred feet in width, extending from Belmont avenue to Charlton street. He also owned two lots immediately adjacent, one on the north of the brewery premises, and the other on the south. That on the south was fifty feet in width, and contained the dwelling in which he resided at the time of his death. The other was larger, being one hundred and twenty-five feet in width, and, at the time of the testator's death was, in part, occupied by a tenant. He purchased it in 1859. He afterwards took down a fence which separated it from the brewery premises at the time of his purchase, and built another in the same place, which was standing when he died. Shortly after the testator's death, a brick stable was erected on this lot, with the receipts of the brewery, which has since been used by the business. During the years 1866 and 1867, a large brick dwelling-house was also erected on this lot, at a cost of over $20,000, which was paid for out of the receipts of the business.

The complainants furnished nearly all the malt used in the business carried on under the will. In the spring of 1871, there remained a balance due to them of over $85,000. On the 2d day of December, 1871, the executors, under power alleged to have been conferred by the will, conveyed

---

and premises aforesaid, and to apply the purchase-money by re-investment in such other property as to her may seem best, &c."

*Hubbard* v. *German Catholic Cong.*, *34 Iowa 31*, a religious society authorized a committee to sell a certain piece of land to pay the debts on another tract.

A power of sale gives no right to exchange (*Ringgold* v. *Ringgold*, *1 Harr. & Gill 11; King* v. *Whiton*, *15 Wis. 684; Taylor* v. *Galloway*, *1 Hamm. 104; Cleveland* v. *State Bank*, *16 Ohio St. 236;* see *Wadsworthville School* v. *McCully*, *11 Rich. 424; Carrington* v. *Goddin*, *13 Gratt. 587*); or to confess judgment (*Huntt* v. *Townshend*, *31 Md. 336*); or to accept an equitable claim of the grantee in part payment (*Waldron* v. *McComb*, *1 Hill (N. Y.) 111*); or to make a deed of trust with power in the truees to sell as they deem advisable (*Smith* v. *Morse*, *2 Cal. 524*); or to convey by attorney (*Black* v. *Erwin*, *Harp. 411; 2 Wms. on Ex'rs 944*): or to make partition (*Borel* v. *Robbins*, *30 Cal. 408; Perry on Trusts ₴ 769; Woodhull* v. *Longstreet*, *3 Harr. 405, 419;* see *Att'y-Gen.* v. *Hamilton*, *1 Madd. 122*).

Ferry v. Laible.

the brewery premises, with the two lots adjacent on either side, to Christopher Wiedenmayer, who, on the 1st day of January, 1872, in conjunction with the widow, Johanna Laible, executed a mortgage to the complainants on the same premises, to secure the payment of $65,000 of this debt. The balance of the debt was relinquished in order to get security for the $65,000.

The primary purpose of the present suit is to compel the payment of this mortgage by a sale of the mortgaged premises. The validity of the mortgage, so far as it affects the estate of the widow, is not questioned. The complainants are entitled to a decree against her. The more important question is, Has it any force against those who are entitled to the fee? It is not necessary to stop to inquire who they are—that question was not spoken to on the argument—it is enough for present purposes to know that all persons now in being, who can claim any estate or interest in the mortgaged premises, are before the court as parties to this suit. The proofs show, quite incontestably, that the conveyance to Wiedenmayer was not made in consummation of an actual sale, but was a mere contrivance to enable him to execute a mortgage to the complainants. He accepted it under an arrangement that he should execute a mortgage to the complainants, and then reconvey the lands. It is not pretended that a contract of sale and purchase was made, or that any price was agreed upon, or consideration paid or given, other than the execution of the mortgage to

Under a power of sale, executors may sometimes grant leases (*Jervoise* v. *Clark*, 6 *Madd.* 96; *Seymour* v. *Bull*, 3 *Day* 388; *Hedges* v. *Riker*, 5 *Johns. Ch.* 163; *Prather* v. *Foote*, 1 *Disn.* 434; *Williams* v. *Woodward*, 2 *Wend.* 487; *Burr* v. *Sim*, 1 *Whart.* 266; *Blake* v. *Sanderson*, 1 *Gray* 333; see *Bonney* v. *Ridgard*, *Cox Ch. Cas.* 145; *Simpson* v. *Bathurst*, *L. R.* (5 *Ch. App.*) 193; *Mitchells* v. *Corbett*, 34 *Beav.* 376; *Hubbard* v. *Elmer*, 7 *Wend.* 446); and they may sell by executory contract (*Demarest* v. *Ray*, 29 *Barb.* 563; *Shippen* v. *Clapp*, 29 *Pa. St.* 265; see *Ives* v. *Davenport*, 3 *Hill* 373); and either at public or private sale (*Huger* v. *Huger*, 9 *Rich. Eq.* 217; *Perry on Trusts* § 770; see *Jackson* v. *Williams*, 50 *Ga.* 553); or make a conditional sale (*Isaac* v. *Farnsworth*, 3 *Head* 275); but a mere quit-claim deed is no execution (*Towle* v. *Ewing*, 23 *Wis.* 336).

the complainants. Indeed, the parties to the transaction did not take the trouble to put on it the guise of a sale. No reference to authorities is required to show that this was not a valid exercise of the power given by the will. The executors were entrusted with power to make sale of the brewery premises, in a certain contingency, but no power to donate the property, nor to create preferences against it in favor of certain creditors, to the exclusion of others. If the executors used the power at all, they were bound to keep within its terms, and any attempt by them to exercise power in excess of that delegated, must be held to be simply nugatory. Where the creator of a power defines the method of its execution, that method must be strictly followed, so far, at least, as may be necessary to give effect to his intent and design. This rule is fundamental. It is clear the conveyance to Wiedenmayer passed no title.

This being so, is it possible to uphold the complainants' mortgage? They are not innocent purchasers for value. They accepted the mortgage as security for a pre-existing debt; they neither paid nor surrendered anything of value, nor did they enter into a new and irrevocable obligation. Besides, one of them admits that he understood that Wiedenmayer had taken title to the mortgaged premises merely for the purpose of settling their claim, and to put himself in a position where he could assist in-the settlement of the estate. This was quite sufficient notice of the real character of the transaction to deprive them of the character of innocent purchasers for value.

---

The *court* may sometimes authorize a mortgage of lands in order to pay debts or legacies (*Selby* v. *Cooling, 23 Beav. 418; Holme* v. *Williams, 3 Sim. 557; Williamson* v. *Field, 2 Sandf. Ch. 533;* see, however, *Brown* v. *Duzee, 44 Vt. 529; Mileage* v. *Bryan, 49 Ga. 396; Patapsco Co.* v. *Morrison, 2 Woods 395);* whether they would authorize a lease (*Treat* v. *Peck, 5 Conn. 280);* but the court will not order a sale where only a power to mortgage is given (*Drake* v. *Whitmore, 5 DeG. & Sm. 619*).

Whether a mortgage exhausts a power of sale (*Elliott's Case, 5 Whart. 524; Asay* v. *Hoover, 5 Pa. St. 21; Piatt* v. *Oliver, 2 McLean 309);* but executors are estopped by a mortgage (*People* v. *Miner, 37 Barb. 466; Ryder* v. *Sisson, 7 R. I. 341; Barker* v. *McAuley, 4 Heisk. 425);* see, further, *1 Am. Law Reg. 128.*—Rep.

But it was very plausibly argued by the counsel of the complainants, that the power to sell, conferred by this will, embraces, also, a power to mortgage, and that if he was right in this contention, the mortgage should be upheld as within the power, for, although not executed by the executors themselves, yet, having been executed by their grantee, to whom they conveyed the mortgaged premises for the purpose of having them mortgaged to the complainants, it should, in a court which deals mainly with the substance of transactions, regardless of mere questions of form, be treated as the deed of the executors. My judgment rejects both propositions as thoroughly unsound. The last is much too devious, and too strongly marked by false suggestions, if not actual falsehood, ever to be recognized as the fit founda- tion of a judicial conclusion.

The other presents a question of legal construction. At one time it was held, by the English court of chancery, that a power to sell implied a power to mortgage, which, it was held, was a conditional sale. *Mills* v. *Banks*, *3 P. Wms. 9 ; 1 Sug. on Pow. 513.* As late as 1838, Lord Coltenham declared: "So long ago as the case of *Mills* v. *Banks*, decided in 1724, it seems to have been assumed as settled, that a power to sell implies a power to mortgage, which is a conditional sale; and no case has been quoted throwing any doubt upon that proposition." *Ball* v. *Harris, 4 Myl. & Cr. 267.* But this was the last occasion on which the doc- trine was ever re-affirmed as broadly as stated by Lord Macclesfield in *Mills* v. *Banks*.

Lord Langdale, as master of the rolls, held, in *Haldenby* v. *Spofforth, 1 Beav. 391,* decided in 1839, that a power of sale did not necessarily imply a power to mortgage, and should never be construed to do so, except where it was clear that the creator of the power meant the estate should be preserved, if possible, and merely gave direction to sell as a means of raising money to answer a particular charge, which could be just as well and as conveniently accom- plished by a mortgage as a sale.

Lord St. Leonards laid down the rule substantially in the same form, in *Stronghill* v. *Anstey, 1 DeG. M. & G. 645.* He says: "Generally speaking, a power of sale, a power of sale out and out, for a purpose, or with an object beyond the raising of a particular charge, does not authorize a mortgage; but where it is for raising a particular charge, and the estate is settled or devised subject to that charge, there it may be proper, under the circumstances, to raise the money by mortgage, and the court will support it as a conditional sale, as something within the power, and as a proper mode of raising money." This view was adopted by Sir J. Romilly, master of the rolls, in *Devaynes* v. *Robinson, 3 Jur.* (*N. S.*) *707, 24 Beav. 86.* Even a more rigid adherence to the intent of the creator of the power, as shown by his words, is required by the New York rule. There, a simple power of sale, no matter what its special object may be, will, in no case, authorize a mortgage. The court, in *Bloomer* v. *Waldron, 3 Hill 361,* said: "When the power is to sell, and something is added over and above, showing that the power of sale is not to be taken in its primary sense, but means a power to mortgage, there the donee may act accordingly. The principal may make his own vocabulary. He may say: 'I authorize a sale, by which word I intend a mortgage.'" When a man directs a sale of his land, whether his object be to raise money for a particular purpose or not, he means to put it in the market for what it will fetch, and avoid the fluctuation of prices. There is a substantial difference between raising money by a mortgage and a sale. The rule is well established, that where one of several methods of executing a power is clearly prescribed by the language of the power, the donee is not at liberty to adopt another, for, by prescribing one, the others are negatived. Under these rules, it is not possible to read the will, in this case, so as to give the executors power to mortgage. In my judgment, the complainants' mortgage is without legal force, except against the estate of the widow.

But this conclusion does not dispose of the whole case; the complainants make a further claim. They assert that the testator, by directing the continuance of his business, embarked his estate in trade, and thereby created a trust, and they, having become creditors of the trust, have a right to ask that it shall be administered in such manner that their debt shall be paid. It has already been decided that so much, and no more, of the testator's estate, as he directed should be employed in the continuation of his business, with the accumulations thereon, stands charged in equity with the debts properly contracted in its prosecution, and that creditors have a right in the first instance, without first exhausting their remedy against the executors personally, to resort to the trade property for the payment of their debts. *Ferry* v. *Laible, 12 C. E. Gr. 146.* The justness of this conclusion and its correctness as a legal proposition, were not questioned on the final argument.

The main point of difficulty which this branch of the case presents is, What shall be considered trade property? What part of his estate did the testator intend to embark in the brewery business? The answer admits that he carried on the brewery business on the lot one hundred feet in width, extending from Belmont avenue to Charlton street. At the time of his death, the whole of this lot was devoted to the purposes of his business; it contained the brewery, the cellars, and other necessary buildings and appliances of the business. In view of the nature and requirements of his business (land and buildings being indispensable to its prosecution), of the uses to which he had devoted this lot, and of his direction that his business should be continued in order that it might be preserved and eventually made the property of his three sons, there can be no doubt as to his purposes in respect to this lot; he meant that it should be the home of the business he wanted fostered, and that it should ultimately go, with the business, to his three sons.

His purposes in respect to the large lot on the north, the one on which the new dwelling was erected, can be dis-

cerned with equal certainty. He separated that from the brewery property by a fence, and treated it as a thing entirely distinct from the brewery premises, and as having no connection with the business he wanted to perpetuate. It is manifest, to my mind, that he did not mean to embark this lot in his *post mortem* venture.

His will in respect to the other lot is not so clear. I think, however, he intended to embark it in the business, and that it should pass to his sons as part of the property he wished sold to them. It was connected with, and used in connection with, the brewery premises. Some of his workmen, employed in the brewery, lived with him in the dwelling on this lot, and there was a passage-way leading directly from the dwelling into the brewery. It will also be remembered that the will directs that the manager of the business shall be furnished with a dwelling-house free of rent, as part of his compensation. The testator had resided on this lot, where his business was constantly under his eye, and where he could at all times give it such care and attention as were necessary to its proper conduct and security. It is reasonable to believe that he desired that the person who should control it after his death, should be in a position where he could give it the same constant care and attention. It is quite obvious that the most important purpose of the testator's testamentary scheme was the perpetuation of his business, and we are bound to read his will in the light of this important fact. In view of all the circumstances of the case, I am convinced that he intended the manager should occupy the dwelling on this lot free of rent. This, in my opinion, was a sufficient embarkation of the lot in the trade, to render it subject to the debts of the trade.

In cases of this character, I think the court is bound, as a matter of common justice, to extend relief to creditors with a liberal hand. According to the usual course of business, brewers' materials purchased in the fall are not paid for until the following summer, after they have been

converted into beer, and the beer sold. In this case the testator intended the business should be carried on on credit; at least, he did not provide a capital for it, but, on the contrary, he gave all his personal property to his wife, except the things belonging to the brewery. Hence it would seem to be quite clear that he expected it to be carried on on credit, according to the usual course of the trade. The law, in its benignity, believes every man to be honest until the contrary is shown. If the court finds a testator has directed a debt to be contracted, it must believe that he intended it should be paid. Here the testator has directed that his business shall be continued after his death. That direction gives expression to the most cherished purpose of his testamentary scheme. Under the provisions of his will, it could not be observed unless debts were contracted. By the continuation of his business, he undoubtedly hoped his bounty to his beneficiaries would be very largely increased. Either ignorantly or designedly, he has made no express disposition of the bulk of his estate except in the contingency that his widow shall die without having contracted a second marriage. In this condition of affairs, it has seemed to me that it would hardly be too much to say, if we impute to the testator the rectitude of purpose which the law imputes to him, that there is some reason to believe that he intended that all his property not transferred and indefeasibly vested immediately on his death, should stand pledged for all debts fairly contracted in conducting his *post mortem* enterprise. However, I am not prepared to adjudge that that is the measure of relief to which creditors are entitled in this case. The lot on the south of the brewery premises, I think, was embarked in business, and constitutes part of the trade property.

Another question remains: Have the creditors any remedy for the recovery of the moneys which have been wrongfully expended in making improvements upon lands not embarked in the trade? The money thus expended, undoubtedly constituted part of the property equitably

bound for the payment of their debts.   If it had been invested upon mortgage, or in the purchase of land, pursuant to the direction of the will, their right to have it applied in satisfaction of their claims would be so clear that it would require something more than courage to dispute it.   A testator, by a direction to continue his trade or business, creates a trust estate which the court will keep separate and apply exclusively to the purposes of the trust. *Owen* v. *Delamere, 15 Eq. Cas. 139.*   This is the foundation doctrine of all the cases.   *Ex parte Richardson, 3 Madd. 138 ; Thompson* v. *Andrews, 1 Myl. & K. 116 ; Cutbush* v. *Cutbush, 1 Beav. 185 ; McNeilie* v. *Acton, 4 DeG. M. & G. 744.*

Lord Eldon declared that the right of creditors to have the trade property applied to the payment of their claims, very closely resembled a lien.   *Ex parte Garland, 10 Ves. 120.*   The persons having the control of the moneys thus expended were trustees; the moneys were subject to a trust, not only in favor of the· beneficiaries under the will, but also in favor of creditors.   The application or use they made of the moneys was an abuse of their trust, at least against creditors, and a fraud upon their rights.   An abuse of trust can confer no rights on the person guilty of the abuse, nor on those who claim in privity with him, simply as donees.   No change in the form or nature of the trust property will divest the trust or impair the rights of the *cestui que trust.*   Lord Ellenborough said, in what has been appropriately styled his masterly judgment, in *Taylor* v. *Plumer, 3 Mau. & Sel. 575:* "It makes no difference in reason or law, into whatever form different from the original the change has been made, for the product of or substitute for the original still follows the nature of the thing itself, as long as it can be ascertained to be such, and the right only ceases when the means of ascertainment fail, which is the case when the subject is turned into money, and merged and confounded in a general mass of the same description. The difficulty which arises, then, is a difficulty of fact, and

not of law." This is the established law of this state. *Shaler* v. *Trowbridge, 1 Stew. 595.*

The only duty remaining is, to apply the legal rule just quoted. This duty, in my judgment, is not embarrassed by any difficulty of fact. It is indisputed that certain moneys subject to a trust in favor of creditors, have been converted into buildings erected on lands belonging to persons who had no right to the moneys as against creditors. If they are permitted to retain the buildings without paying for them, or making restitution in any other form, they will be allowed to withhold, against the rightful owners, the proceeds of a breach of trust, committed by their ancestor for her and their joint benefit, and that, too, when the product of or substitute for the trust property, is not only plainly distinguishable, but is, figuratively speaking, before the eyes of the court, and can, according to its established methods of procedure, be estimated and valued, and sequestered for the benefit of the rightful owners. Under such a state of facts, there ought to be no doubt as to the power of the court. There is no difficulty in ascertaining the value of the buildings, or of the land in which they are incorporated. It is familiar practice, in actions for partition, to direct an inquiry to ascertain the value of improvements, where one tenant in common has erected buildings on the lands held in common, and, in case of a sale, to decree compensation to him out of the proceeds of sale. *Hall* v. *Piddock, 6 C. E. Gr. 311; Doughaday* v. *Crowell, 3 Stock. 201; Obert* v. *Obert, 1 Hal. Ch. 397; Brookfield* v. *Williams, 1 Gr. Ch. 341.* There is no alchemy in the mere fact of incorporation. The rule of practice just mentioned was an invention of equity to remedy injustice and prevent the loss of rights. It is peculiar to no special form of action, but may be adopted in any case whenever it is necessary to the promotion of justice.

In any ordinary case, where the owner of the land improved was of full capacity, and in a position to protect himself, the proper course of procedure, I think, would be

Ferry *v.* Laible.

to direct an inquiry to ascertain the amount of trust funds wrongfully expended, and, when this fact was found, to decree its payment, or, in case of default, that the land should be sold. That course is impracticable in this case, but this one will be adopted : If it shall hereafter appear that the funds wrongfully expended in the construction of buildings are necessary for the payment of the debts of the trade, a sale of the land, with the buildings, will be ordered. After the sale, a reference will be ordered to ascertain the full market value of the land, exclusive of the buildings, and without reference to the sum bid at the sale ; the sum thus ascertained as the full market value of the land, will be set apart out of the proceeds of sale, for the benefit of the persons who may appear hereafter to be entitled to the land, and the balance will be applied in liquidation of the debts. This course will give the beneficiaries under the will all they were ever entitled to, and all they can ask, if they are honest, and will give the creditors such protection as may be awarded to them, without possibility of wrong to others.

John Laible Jr., the manager appointed by the will, died in March, 1873. His representative is before the court, by cross-bill, seeking to have the balance due for his compensation under the will, declared a lien on the trade property and assets. I know of no rule, legal or equitable, which will sustain this claim. None was mentioned on the argument which, in my judgment, gives it the least support. In the absence of a pledge, or contract, or some special equity entitling one creditor to preference over another, equality is always equity. That maxim must prevail in this case. All creditors occupy the same rank. If there is enough to pay each in full, all must be paid; if not, the assets must be distributed among them equally, in proportion to the amount of their respective debts. This suit is, in fact, a suit by a creditor for the discovery of assets held in trust for creditors, and to have the trust executed and the assets properly administered. It must be so treated.

Ferry *v.* Laible.

My conclusions upon the whole case are :

First—The complainants' mortgage is valid against the estate of the widow, but invalid against every other estate attempted to be charged thereby.

Second—The trade property and assets, including all gains which have been made thereon, constitute a fund which equity will treat as pledged for the payment of all debts properly contracted in the trade.

Third—The real estate embarked by the testator in the continuation of his business, consisted of the first and second tracts described in the complainants' bill; these, with the implements, fixtures and personal property of the business, whether owned by the testator at the time of his death or purchased with the proceeds or property of the trade since, should be held to be the trade property proper, and should be converted into money, under the direction of the court, and be applied first, and before resort is had to any other fund for the payment of the debts.

Fourth—All the creditors of the business are entitled to share *pro rata* in the distribution of its assets, in case they are not sufficient to pay all in full, and to that end an inquiry should be ordered to ascertain who they are, and the amount of their respective claims.

Fifth—If sufficient money is not realized from the trade property and assets proper, to pay all the debts, together with the costs and expenses of administration, resort should be had, in the mode already indicated, to the buildings erected with the moneys of the trade.

The decree should be settled, upon notice.